UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WANDA PERNELL-HARRIS,

    Plaintiff,

vs

OAKLAND COMMUNITY COLLEGE,

    Defendant.
_____/
PITT, McGEHEE, PALMER, & RIVERS, P.C.
Michael L. Pitt (P24429)
Andrea J. Johnson (P74596)
Attorneys for Plaintiff
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
Tel: 248-398-9800
Fax: 248-398-9804
mpitt@pittlawpc.com
ajohnson@pittlawpc.com
_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, Wanda Pernell-Harris ("Harris") complains against Oakland Community College, ("OCC") as follows:

### INTRODUCTION

1. This is a discrimination and retaliation action brought pursuant to the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"), M.C.L. 37.1101, *et seq*.

2. In this action, Harris seeks equitable relief and legal damages to enforce her rights under the ADA, Rehabilitation Act, and the PWDCRA to be free from discrimination

and retaliation in employment on the basis of her advocacy on behalf of persons with disabilities.

## JURISDICTION, VENUE, & PARTIES

3. Harris is an individual residing in the City of Southfield, County of Oakland, State of Michigan.

4. OCC is a Michigan community college district organized and operating under Act 331 of 1966, Community College Act of 1966, pursuant to Const. 1963, art 8, §7, located in the County of Oakland, State of Michigan, with its principal place of business in Bloomfield Hills, Michigan.

5. This Court has subject matter jurisdiction over Harris's ADA and Rehabilitation Act claims pursuant to 28 U.S.C § 1331 because they arise under federal law.

6. This Court has supplemental jurisdiction over Harris's PWDCRA claims because the claims arise out of the same set of facts as Harris's federal claims, such that all claims form part of the same case or controversy.

7. This Court has personal jurisdiction over OCC because OCC operates and conducts substantial business in the Eastern District of Michigan and the events giving rise to this action occurred in the Eastern District of Michigan.

8. Venue is proper in the Eastern District of Michigan, Southern Division, because the events giving rise to the action occurred in this district and division.

9. Harris exhausted her administrative remedies by filing a timely charge of disability discrimination with the Equal Employment Opportunity Commission.

10. Harris's Complaint is filed within ninety days of her receipt of a notice of right-to-sue from the Equal Employment Opportunity Commission.

**STATEMENT OF FACTS**

11. OCC is a publicly funded community college, which provides higher education and lower-level tertiary education to students.

12. OCC is governed by a seven person Board of Trustees (hereinafter "Board").

13. Harris began her employment with Defendant in February 1991 as an Academic Support Coordinator for the Department of the Program for Academic Support Services (PASS). This department is currently known as the Accessibility Compliance Center and Education Support Services (ACCESS), and Harris's position is currently known as ACCESS Coordinator.

14. The ACCESS program provides accommodations and services to students with documented disabilities as required by the ADA, the PWDCRA, and Sections 504 & 508 of the Rehabilitation Act of 1973.

15. The ACCESS program provides services such as sign language interpreters, note takers, readers, recorded materials, tutors, learning station modification, and special instructional equipment to students with disabilities. These services are provided for students with disabilities to realize academic success in compliance with State and Federal law.

16. As ACCESS Coordinator for the Southfield Campus of OCC, Harris served as the contact person between the student, faculty, and external agencies to investigate and resolve concerns regarding the accommodation of students with disabilities.

17. Throughout her employment with OCC, Harris's performance was fully satisfactory and Harris met all legitimate expectations of OCC.

18. Throughout her employment with OCC, Harris encountered adversity and hurdles with respect to advocacy and accommodations on behalf of students with disabilities; however, in approximately December of 2012, Harris determined that OCC's refusal and failure to accommodate students was in violation of the ADA and the Rehabilitation Act.

19. For example, ACCESS students were being denied use of the Academic Support Center as a testing center.

20. In addition, the ACCESS program was understaffed such that student needs for accommodations and services were not being met and confidentiality for students was breached.

21. On December 10, 2012, Harris requested a meeting with William MacQueen ("MacQueen"), Vice Chancellor of Human Resources, regarding issues of health and safety of minors on the Southfield Campus, funding, and personnel needs for the ACCESS program.

22. Harris made clear she wished to share her concerns that issues involving the ACCESS program were being ignored and students were not receiving appropriate accommodations in violation of the ADA and Rehabilitation Act.

23. MacQueen did not meet with Harris about these concerns and, to her knowledge, these concerns were not addressed.

24. On January 22, 2013, during a Public Comment session at an OCC Board meeting, Harris appealed to the Board with her concerns. Upon information and belief,

present at this Board meeting were representatives of the American Association of Community Colleges.

25. Harris presented each Board member with a three-page letter stating that OCC was discriminating against and failing to accommodate ACCESS students in violation of the ADA and Rehabilitation Act.

26. Harris read the first page of this letter aloud during the Board meeting, including the allegation that OCC was violating the law with respect to ACCESS students and that OCC had a culture of perpetuating discrimination and legal violations.

27. Soon thereafter, Harris began to experience a retaliatory hostile work environment as a result of her advocacy on behalf of disabled students and her report that OCC was violating the law.

28. On February 4, 2013, Cathy Maze ("Maze"), Associate Vice Chancellor, requested that Harris participate in a meeting to address her comments to the Board.

29. This meeting was held on February 25, 2013, with Harris; Maze; Gary Casey ("Casey), EEOC Officer; MacQueen, Vice Chancellor of Human Resources; Mary Sheble ("Sheble"), Harris's supervisor and Dean, Division of Learning Resources, Southfield; Steven Reif ("Reif"), President of Southfield Campus; and Margaret Carroll ("Carroll"), Director of Human Resources.

30. Harris believed that the purpose of the meeting was to address her concerns relative to the ACCESS program and ADA and Rehabilitation Act violations; however, the meeting was used as a time to reprimand Harris for her advocacy and report of violations of law before the Board.

31. During this meeting, Harris experienced personal attacks from Carroll and Casey. Harris felt bullied and ridiculed. Casey told Harris that her level of advocacy was outside her job description and accused Harris of acting as a social worker because of her advocacy on behalf of students.

32. These attacks were due to Harris reporting to the Board and advocating on behalf of ACCESS students.

33. During this meeting, OCC failed to address remedies to Harris's concerns or the violations of law that she reported.

34. After the February 25, 2013 meeting, Harris's supervisor, Sheble, who witnessed the attacks Harris suffered, acknowledged the intimidating nature of the meeting and hugged Harris.

35. On April 2, 2013, Harris was reprimanded by Casey in an email sent to MacQueen, Carroll, Maze, and others at OCC. This reprimand was unwarranted and part of a continuing pattern of hostility toward Harris for reporting violations of law.

36. On May 30, 2013, an ACCESS student sent a written complaint to Harris regarding the failure to be accommodated by OCC with respect to a testing center.

37. The student stated that ACCESS students were continuing to be denied use of an appropriate testing center that would meet their individual needs. As a result, students took their exams outside of the class at an alternative location and were left unattended.

38. The student also complained that there was a delay in grading and returning exams to ACCESS students.

39. In July 2013, Harris was falsely accused of failing to follow policy with respect to her participation in an audit of students receiving federal funding.

40. In September and October 2013, Casey began to make multiple harassing and bullying calls to Harris and the ACCESS department in order to pressure Harris to hire an individual who was a registered sex offender to tutor ACCESS students.

41. On October 28, 2013, Harris spoke with the probation officer for the individual Casey was pressuring her to hire. Harris discovered that he had a recent sex offender conviction, he had not completed treatment, and he had recently violated his probation.

42. That same day, Harris notified officials at OCC who suggested she forward the information to Casey.

43. Due to Casey's hostility toward her, she instead discussed the matter with MacQueen.

44. On October 31, 2013, Harris requested to meet with MacQueen in order to report that she was experiencing a retaliatory hostile work environment.

45. Harris arrived at the meeting to find Carroll in addition to MacQueen.

46. Harris was uncomfortable with Carroll's presence due to her behavior during the February 25, 2013 meeting.

47. During this meeting, Harris stated that she was experiencing a hostile work environment because of her comments to the Board in January 2013. She stated she was being bullied, harassed, and personally attacked. She stated the hostile work environment negatively impacted her overall health and caused her to experience uncontrolled crying spells, anxiety, and difficultly controlling her hypertension and diabetes.

48. Harris told MacQueen and Carroll that she was considering applying for early retirement due to the intolerable hostile work environment.

49. At the conclusion of the meeting, MacQueen and Carroll recommended that Harris take a medical leave of absence and told Harris they would share her concerns with the Chancellor.

50. Harris's hostile work environment continued and OCC took no action to remedy it.

51. On November 18, 2013, Harris sent a follow up email to MacQueen and Carroll to inquire about the outcome of their discussion of the retaliatory hostile work environment.

52. Harris never received a response to this email and OCC failed to take any action to remedy the hostile work environment

53. Due to the negative impact the retaliatory hostile work environment was having on Harris's health, Harris contacted her doctor on December 1, 2013 to schedule an appointment.

54. On December 6, 2013, Harris attended a meeting with Casey regarding accommodations for ACCESS student as part of her duties as ACCESS Coordinator.

55. During this meeting, Casey acted in a hostile manner toward Harris, yelled at her, and ridiculed her.

56. Casey accused Harris of interfering with the Department's "academic freedom" and failing to understand her job duties. Casey also accused Harris of misinterpreting the school's responsibilities to accommodate students.

57. On December 11, 2013, Harris treated with her doctor for symptoms resulting from the retaliatory hostile work environment. Her doctor recommended that she see a psychiatrist due to work related stress.

58. Harris's psychotherapist recommended that she take a leave of absence beginning March 3, 2014 due to the negative impact on her health caused by the retaliatory hostile work environment.

59. Harris's doctor has instructed her not to return to the hostile work environment.

60. As of the date of the filing of this Complaint, Harris's psychiatric condition prevents her from returning to work.

61. Harris was constructively discharged due to an intolerable hostile work environment in retaliation for her advocacy on behalf of students with disabilities and her reporting of suspected violations of the ADA and Rehabilitation Act.

## COUNT I
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

62. Harris incorporates the foregoing allegations by reference as though stated in full herein.

63. Title II of the ADA makes it unlawful for a public entity to discriminate against students on the basis of disability.

64. Title V of the ADA makes it unlawful for an employer or public entity to discriminate or retaliate against an individual because the individual opposes an act or practice which violates the ADA. 42 U.S.C. § 12203(a).

65. Title V of the ADA further makes it unlawful for an employer or public entity to coerce, intimidate, threaten or interfere with any individual because she has aided or encouraged another individual in the exercise of rights granted by the ADA. 42 U.S.C. § 12203(b).

66. At all relevant times, OCC is a public entity for purpose of Title II of the ADA.

67. At all relevant times, Harris engaged in protected activity by opposing violations of the ADA when she opposed disability discrimination and failure to accommodate students with disabilities.

68. At all relevant times, Harris engaged in protected activity by aiding and encouraging other individuals in the exercise of their rights granted by the ADA when she advocated on behalf of students with disabilities and assisted them in receiving appropriate accommodations.

69. At all relevant times, Harris engaged in protected activity by filing a charge of discrimination with the Michigan Department of Civil Rights (MDCR) and Equal Employment Opportunity Commission (EEOC)

70. OCC was aware of Harris's opposition to violations of the ADA.

71. OCC was aware of Harris's advocacy, encouragement, and aid to individuals in the exercise of their rights granted by the ADA.

72. OCC was aware of Harris's charge of discrimination the MDCR and EEOC.

73. Under the ADA, OCC was legally obligated to refrain from discriminating or retaliating against Harris because of her opposition to violations of the ADA, her encouragement and aid to individuals in the exercise of their rights granted by the ADA, and her charges of discrimination with the MDCR and EEOC.

74. Notwithstanding its obligations under the ADA and in willful violation thereof, OCC deliberately created an intolerable hostile work environment in retaliation for Harris's protected activity.

75. As a direct result of OCC's retaliatory conduct towards Harris, Harris was constructively discharged and has experienced and will continue to experience economic losses in the nature of lost wages and benefits, as well as other forms of economic and non-economic damages, including emotional distress, humiliation, anguish, and pain and suffering.

**COUNT II**
**VIOLATION OF MICHIGAN'S**
**PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**

76. Harris incorporates all of the foregoing allegations by reference as though stated in full herein.

77. Article IV of Michigan's Persons With Disabilities Civil Rights Act (PWDCRA), M.C.L. 37.1401, et seq., makes it unlawful for an educational institution to discriminate in any manner against students because of disability.

78. Article VI of the PWDCRA, M.C.L. 37.1602, makes it unlawful for a person to retaliate or discriminate against an individual because that individual has opposed a violation of the PWDCRA.

79. At all relevant times, OCC was a person within the meaning of Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), M.C.L. 37.1101, *et seq*.

80. At all relevant times, OCC was an educational institution within the meaning of the PWDCRA. M.C.L. 37.1401; M.C.L. 37.1402.

81. At all relevant times, Harris engaged in protected activity by opposing violations of the PWDCRA when she opposed disability discrimination and failure to accommodate students with disabilities.

82. At all relevant times, Harris engaged in protected activity by filing charges of discrimination with the MDCR and EEOC.

83. OCC was aware of Harris's opposition to violations of the PWDCRA.

84. OCC was aware of Harris's encouragement and aid to individuals in the exercise of their rights granted by the PWDCRA.

85. OCC was aware of Harris's charge of discrimination with the MDCR and EEOC.

86. Under the PWDCRA, OCC was legally obligated to refrain from discriminating or retaliating against Harris because of her opposition to violations of the PWDCRA and her charge of discrimination with the MDCR and EEOC.

87. Notwithstanding its obligations under the PWDCRA and in willful violation thereof, OCC deliberately created an intolerable hostile work environment in retaliation for Harris's protected activity.

88. As a direct result of OCC's retaliatory conduct towards Harris, Harris was constructively discharged and has experienced and will continue to experience economic losses in the nature of lost wages and benefits, as well as other forms of economic and non-economic damages, including emotional distress, humiliation, anguish, and pain and suffering.

**COUNT III**
**VIOLATION OF SECTION 504 OF**
**THE REHABILITATION ACT OF 1973**

89. Harris incorporates all of the foregoing allegations by reference as though stated in full herein.

90. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, makes it unlawful for a publicly funded postsecondary institution or college to discriminate against, exclude, or deny benefits to individuals on the basis of disability. 29 U.S.C. § 794(a),(b).

91. The Rehabilitation Act of 1973, 29 U.S.C. § 794a(a)(2) incorporates the anti-retaliation provision of Title VI of the Civil Rights Act of 1964, and makes it unlawful to retaliate or discriminate against any individual for attempting to protect or enforce rights and protections granted by the Rehabilitation Act.

92. At all relevant times, OCC was a program or activity receiving Federal financial assistance within the meaning of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

93. At all relevant times, Harris engaged in protected activity by advocating on behalf of students with disabilities and opposing violations of the Rehabilitation Act.

94. At all relevant times, Harris engaged in protected activity by aiding and encouraging students with disabilities in the exercise of their rights granted by the Rehabilitation Act when she advocated on behalf of students with disabilities and assisted them in receiving appropriate accommodations and filed an MDCR and EEOC charge.

95. OCC was aware of Harris's opposition to violations of the Rehabilitation Act.

96. OCC was also aware of Harris's encouragement and aid to individuals in the exercise of their rights granted by the Rehabilitation Act.

97. OCC was aware of Harris's advocacy on behalf of students with disabilities under the Rehabilitation Act.

98. Under the Rehabilitation Act, OCC was legally obligated to refrain from discriminating or retaliating against Harris because of her attempt to protect the rights of

persons with disabilities and her encouragement and aid to individuals in the exercise of their rights granted by the Rehabilitation Act.

99. Notwithstanding its obligations under the Rehabilitation Act and in willful violation thereof, OCC deliberately created an intolerable hostile work environment in retaliation for Harris's protected activity.

100. As a direct result of OCC's retaliatory conduct towards Harris, Harris was constructively discharged and has experienced and will continue to experience economic losses in the nature of lost wages and benefits, as well as other forms of economic and non-economic damages, including emotional distress, humiliation, anguish, and pain and suffering.

**RELIEF REQUESTED**

Based on the violations of the ADA, PWDCRA, & Rehabilitation Act alleged above, Harris requests the following relief:

- A. Equitable relief including reinstatement to her former position, or to a comparable position, in order to make her whole;
- B. Front pay in lieu of reinstatement;
- C. Compensation in the form of all lost wages, benefits, and other forms of compensation, both economic and non-economic, past and future, resulting from the discriminatory treatment described in this charge;
- D. Liquidated damages;
- E. Punitive damages;
- F. Costs, interest, and attorney fees; and

G. Other relief as the Court deems just and equitable.

Respectfully submitted,

PITT, MCGEHEE, PALMER & RIVERS, P.C.

By: */s/ Andrea J. Johnson P74596*
Michael L. Pitt (P24429)
Andrea J. Johnson (P74596)
Attorneys for Harris
117 W. Fourth Street, Suite 200
Royal Oak, Michigan  48067
(248) 398-9800
(248) 398-9804 (fax)
mpitt@pittlawpc.com
ajohnson@pittlawpc.com

Dated: December 8, 2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WANDA PERNELL-HARRIS,

    Plaintiff,

vs

OAKLAND COMMUNITY COLLEGE,

    Defendant.
_____/
PITT, McGEHEE, PALMER, & RIVERS, P.C.
Michael L. Pitt (P24429)
Andrea J. Johnson (P74596)
Attorneys for Plaintiff
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
Tel: 248-398-9800
Fax: 248-398-9804
mpitt@pittlawpc.com
ajohnson@pittlawpc.com
_____/

## DEMAND FOR JURY TRIAL

Plaintiff, Wanda Pernell-Harris, by and through her attorneys, Pitt, McGehee, Palmer & Rivers, P.C., herein demands a trial by jury of all issues to the within cause of action.

                               Respectfully submitted,

                               PITT, MCGEHEE, PALMER & RIVERS, P.C.

                               By: */s/ Andrea J. Johnson P74596*
                               Michael L. Pitt (P24429)
                               Andrea J. Johnson (P74596)
                               Attorneys for Harris
                               117 W. Fourth Street, Suite 200
                               Royal Oak, Michigan 48067
                               (248) 398-9800
                               (248) 398-9804 (fax)
                               mpitt@pittlawpc.com
Dated: December 8, 2014                 ajohnson@pittlawpc.com